ZAVEN A. SARGSIAN (SBN: 347900)
Email: zsargsian@buchalter.com
BUCHALTER
A Professional Corporation
60 E. South Temple, Suite 1200
Salt Lake City, UT 84111
Telephone: 801.401.8625

*Attorneys for Plaintiff Seda Grigoryan*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEDA GRIGORYAN, an individual,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>NO FRONTIERS PRODUCTION, LLC,<br><br>　　　　Defendant. | Case No.<br><br>**COMPLAINT FOR FRAUDULENT INDUCEMENT AND RESCISSION** |

Plaintiff Seda Grigoryan ("Grigoryan"), through her undersigned counsel, hereby complains against Defendant No Frontiers Production, LLC ("NFP"), and alleges as follows:

## NATURE OF ACTION

1.　　Plaintiff Grigoryan is a freelance journalist with experience working with international media organizations, and has been particularly interested in the area of cultural heritage protection.

2.　　In November 2023, NFP fraudulently induced Grigoryan to enter into a production services contract and to create footage. Prior to the contract's signing, NFP expressly told Grigoryan that the footage would be used in a History Channel pilot about ancient civilizations. In reality, the footage created by Grigoryan was used for political and propaganda purposes, which harmed Grigoryan and caused

her to be subjected to unwanted attention and hateful public comments.

3.      The purpose of this lawsuit is to rescind the Production Services Agreement (the "Agreement") so that Grigoryan can reclaim her copyrights related to the footage, and ensure that Grigoryan's work and creative efforts are not used for improper reasons.

## PARTIES / JURISDICTION / VENUE

4.      Grigoryan is a resident and citizen of Yerevan, Republic of Armenia ("Armenia").

5.      Upon information and belief NFP is an unregistered limited liability company with a principal place of business located in Los Angeles, California.

6.      Upon information and belief NFP's members are residents of California.

7.      The amount in controversy is greater than $75,000.00.

8.      The district court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2).

9.      Under 28 U.S.C. § 1391(b)(1), venue is proper in this district court because, upon information and belief, NFP is a resident of California and resides in this judicial district.

## FACTUAL ALLEGATIONS

### i.      *Grigoryan is a filmmaker based out of Armenia.*

10.     Grigoryan is a documentary filmmaker based in Yerevan, Armenia. Over the years, she has worked as a filmmaker and videographer with several reputable media organizations, such as the BBC, NPR, and CBN.

11.     Whenever TV crews or representatives for international media organizations arrive in Armenia, Grigoryan (and other professionals like her) first work to get the TV crew accredited with the Armenian Ministry of Foreign Affairs so the crew is allowed to work on the territory of Armenia.

12.     Around summer 2023, one of Grigoryan's colleagues recommended

she register a profile with www.WorldFixer.com ("World Fixer") because of the number of international media organizations requesting Grigoryan's services. World Fixer is a well-known platform where media companies can connect with production professionals located around the world.

13. On or about October 25, 2023, Grigoryan registered with WorldFixer.

14. On November 26, 2023, Grigoryan received a message from a WorldFixer user named Alex Gil ("Gil").

15. Gil was a representative for NFP at all relevant times.

16. Gil introduced himself as a "production manager, freelancer," and stated: "We are working at [*sic*] a pilot film about World's mysterious and lost civilizations for History Channel. One of them is Urartu. We need to shoot two interviews with Armenian historians and archeologists. Would you be interested in working with us? With best regards, Alex."

17. Urartu was an Iron Age kingdom (from around 860 B.C. to 590 BC/547 BC), that was located around the Armenian highlands and extended over the modern frontiers of Turkey, Iran, Iraq, and Armenia.

18. Archeologists have uncovered several Urartian sites, including a fortress located in Yerevan, Armenia referred to as the Erebuni Fortress (the "Fortress"). Excavations of the Fortress have revealed a palace, a royal assembly hall, temples, and over a hundred rooms, in addition to numerous artifacts.

19. Because Grigoryan has focused her work in the field of cultural heritage protection, Grigoryan was well suited for the proposed project and interested in Gil's offer to work on a documentary pilot for the History Channel.

20. Grigoryan responded to Gil by expressing her interest in the project, and over the course of the next few days, they communicated about the project. Among other things, Gil represented to Grigoryan that:

The pilot episode will consist of three World's famous sites – Yerevan (Urartu Kingdom), Jericho (Palestine/Israel) and Tashkent/Bukhara

BUCHALTER
A PROFESSIONAL CORPORATION
SALT LAKE CITY

**Complaint**
BN 86552802v3

(Uzbekistan). The pilot is to show the richness and variety of the
whole upcoming series. These three sites are historically isolated, but
united by the concept I sent you in one of the emails.

21.    Gil also represented to Grigoryan that the History Channel needed her
to interview two individuals: Dr. Miqayel Badalyan, the head of Erebuni museum
in Armenia, and another person selected by Grigoryan or Dr. Badalyan—who was
knowledge about Urartian history in Armenia. Gil also indicated that neither he nor
the History Channel's crew intended to travel to Armenia for the pilot's production.

22.    Grigoryan knew Dr. Badalyan personally and considered Dr. Badalyan
an excellent interview because of his vast knowledge about Urartu and the Fortress.
Grigoryan and Dr. Badalyan discussed the project and together agreed to
recommend that Grigoryan also interview Vahe Sargsyan, the deputy director of the
Erebuni museum in Armenia.

23.    In all of Grigoryan's communications with Gil, NFP's representative,
Gil was professional and appeared to be generally knowledgeable about Urartu.
Moreover, nothing about Gil's communications or proposed project seemed
suspicious because, among other things, the proposed topic—a historical account of
Urartu as part of three historical sites—was not political.

24.    Also, because neither Gil nor the History Channel's crew intended to
travel to Armenia for the production, Grigoryan did not believe it was necessary to
register them with the Ministry of Foreign Affairs.

ii.    ***Grigoryan and NFP enter into the written Agreement.***

25.    Soon after Grigoryan obtained Gil's approval for the second
interviewee, Gil, on behalf of NFP, sent Grigoryan the Agreement, a copy of which
is attached as Exhibit A.

26.    On or about November 27, 2023, NFP and Grigoryan entered into the
Agreement.

27.    The Agreement made the same false representations that NFP, through Gil, previously made, including that Grigoryan—as the "Contractor"—would "render production services for Producer [defined as NFP] on Producer's documentary series' pilot with working title 'Unearthing the Mystery' (the 'Program') in Armenia (the 'Site'), with services commencing on or about November 28, 2023 and terminating on or about December 6, 2023." (Agreement at 1.)

28.    Moreover, the Agreement stated that the "services to be rendered by Contractor shall generally consist of preparation and conducting interviews with local historians and archaeologists. Such services shall include, without limitation:

- Preparation and coordination of the interviews (2 interviews)
- Conducting (recording) interviews (2 interviews)
- B-rolls of the approved sites/general city
- Uploading rushes/transferring rushes to the Producer.
- any other services reasonably required by Producer."

(*Id.*)

29.    The Agreement also provided that Grigoryan and NFP intended to "agree upon a final budget" and agreed that "[t]he Budget payment schedule shall be as follows: fifty percent (50%) upon the later approval of the Budget and the full execution of this Agreement, thirty percent (30%) two (2) days before commencement of the shoot at the Site, and the remaining twenty percent (20%) upon Contractor's provisions of the rushes to Producer." (*Id.*)

30.    The Parties agreed that "the laws of the State of California, United States of America, shall govern this Agreement." (*Id.* at 2.)

### iii.    *Grigoryan begins filming the interviews about Urartu.*

31.    On November 29, 2023, before filming, NFP made the first payment to Grigoryan in the amount of $600.00. NFP made the payment to Grigoryan using a MoneyGram account registered to an individual named Pavel Khanyutin.

32.    On December 1, 2023, Gil sent Grigoryan a list of proposed interview questions for Dr. Badalyan. Although none of the questions raised concerns that the project was other than what NFP represented, Grigoryan did again inquire from Gil whether any other individuals, besides Dr. Badalyan and Sargsyan, would be filmed on the Urartu topic. Gil again represented that the segment on Urartu would be one of three separate parts about ancient civilizations and would be based solely around the interviews of Dr. Badalyan and Sargsyan.

33.    On December 2 and 3, Grigoryan filmed her interviews of Dr. Badalyan and Sargsyan. Also as part of the project, Grigoryan provided footage of the Fortress and related sites, and areas of Yerevan city.

34.    Grigoryan shared the interview footage with Dr. Badalyan and Sargsyan, both of whom were satisfied with the quality and the end product.

35.    On December 3, 2023, Grigoryan sent the video footage to NFP.

36.    On December 5, 2023, Gil informed Grigoryan that NFP was very happy with Grigoryan's work, that he was working on the pilot and would likely finish editing it by mid-January, and would get in touch with Grigoryan around then to discuss details about filming the full documentary—in contrast to Grigoryan's instant work, which was purportedly for a pilot.

### iv.    *Grigoryan discovers NFP's false representations.*

37.    On or about January 3, 2024, Grigoryan received an unexpected call from a local journalist in Armenia. The journalist informed Grigoryan that the journalist was calling from Dr. Badalyan's office and that Grigoryan was on speakerphone, being recorded. The journalist asked Grigoryan to explain why portions of her work had appeared in an online video claiming that Yerevan, the capital of Armenia, was in fact historically Azerbaijani land.

38.    Grigoryan was shocked by the journalist's question and had no knowledge about the online video the journalist was referring to.

39.    Grigoryan soon discovered that her work, including portions of her

BUCHALTER
A PROFESSIONAL CORPORATION
SALT LAKE CITY

interview with Dr. Badalyan and Sargsyan, had been used in a misleading manner as part of a purported documentary claiming that Yerevan was native Azerbaijani land (the "Propaganda Piece"). Among other outlets, the Propaganda Piece was published to YouTube by CBC TV Azerbaijan on January 2, 2024: https://www.youtube.com/watch?v=Y78hqoXSStg&t=1041s.

40.    In the Propaganda Piece, Grigoryan's work was used in minutes 01:42-02:26 (depicting local streets, museum building, school kids visiting the museum), and minutes 16:38-17:21 (audio and visuals of the interview of Dr. Badalyan).

41.    The Propaganda Piece has since been published numerous times, and Grigoryan's work has been used as follows:

      i.  **January 4, 2024**:

          https://www.youtube.com/watch?v=pFHbw2_eWuQ (minutes 03:38-03:44 containing video of Dr. Badalyan's interview);

      ii.  **January 15, 2024**:

          https://www.youtube.com/watch?v=Y32owPB2zos (minutes 00:24-01:05 containing video of Dr. Badalyan's interview);

     iii.  **February 18, 2024**:

          https://www.youtube.com/watch?v=NyHI8PRf_6o (minutes 03:02-03:35 containing video of visitors at the Erebuni archaeological site, drone shots of the area, and video of Dr. Badalyan's interview); (minutes 04:21-04:24 containing video of Dr. Badalyan's interview); (minutes 06:09-06:30 containing video of the interior and visitors at EPOS Club located in Yerevan, Armenia);

     iv.  **February 19, 2024**:

          https://www.youtube.com/watch?v=rKHZAApTbpU (minutes 00:00-00:32 containing video of visitors at the Erebuni archaeological site, drone shots of the area, and video of Dr.

BUCHALTER
A PROFESSIONAL CORPORATION
SALT LAKE CITY

**Complaint**
BN 86552802v3

Badalyan's interview); (minutes 01:18-01:21 containing video of

Dr. Badalyan's interview);

v. **September 6, 2024**: https://www.youtube.com/watch?v=Fv-
s8Y3q5kw (minutes 05:02-05:11 containing drone shots of

Erebuni archaeological site; minutes 06:40-07:54 containing

sunrise shot, drone shots and footage of Erebuni archaeological

site; 08:14-08:17 containing video of the city view from Erebuni;

08:23-08:28 containing video of Dr. Badalyan's interview; 08:41-

08:56 containing video of Abovyan Street, interview of Mr.

Sargsyan, and passersby on the streets of Yerevan).

42.    CBC stands for Caspian Broadcasting Company, and is an Azerbaijani channel owned by the State Oil Company of the Republic of Azerbaijan (SOCAR), an Azerbaijan state-owned national oil and gas company headquartered in Azerbaijan.

43.    Setting aside the historical revisionism, the Propaganda Piece was problematic because, among other things, (1) there already exists significant animus between Azerbaijan and Armenia, the root cause of which is a conflict related to Nagorno-Karabakh, a territory located in the South Caucasus; and (2) the Propaganda Piece merely perpetuates the cycle of animosity.

44.    Unfortunately, this animosity pervades each country's respective society, and is significant enough that in September 2021, Armenia filed an Application with the UN Committee on the Elimination of Racial Discrimination instituting proceedings against Azerbaijan concerning Azerbaijan's alleged violations of the International Convention on the Elimination of All Forms of Racial Discrimination (CERD) of 21 December 1956. Among other things, Armenia alleged that "[f]or decades, Azerbaijan has subjected Armenians to racial discrimination," that "Anti-Armenian hate is formal State policy, taught in schools and regularly espoused at the highest levels of government, with Azerbaijan's

**Complaint**
BN 86552802v3

President . . . himself leading the way." *Armenia vs. Azerbaijan*, Application, ICJ (16 Sept. 2021), https://www.icj-cij.org/sites/default/files/case-related/180/180-20210916-APP-01-00-EN.pdf. Azerbaijan disputes the allegation and instituted its own proceeding based on the CERD.

45.     As the Propaganda Piece began circulating in Armenia, local Armenian news media continually discussed it, and Grigoryan, Dr. Badalyan, and Sargsyan were identified as taking part in the Propaganda Piece.

46.     The Propaganda Piece was also published online when tensions between the states of Armenia and Azerbaijan had reached a fever pitch. On September 19, 2023, only three months before CBC published the video in January 2024, Azerbaijani military forces launched an "anti-terrorist operation" against the remaining ethnic-Armenian population in Nagorno-Karabakh resulting in all Armenians, more than 100,000 people, being displaced from their homes in Nagorno-Karabakh.

47.     As a result of NFP's false representations—which caused Grigoryan to unknowingly provide work for the Propaganda Piece—Grigoryan's work and creative expression was used in a way that Grigoryan never intended (and never would have agreed to), Grigoryan's reputation was harmed, and Grigoryan was subjected to unwanted attention from the Armenian government, and negative comments and accusations were directed towards here by members of the public.

## FIRST CAUSE OF ACTION
### (Rescission)

48.     Grigoryan realleges and incorporates by reference each of the preceding paragraphs.

49.     At all relevant times, Gil was acting as NFP's representative and was acting on behalf of NFP.

50.     Prior to entering into the Agreement with Grigoryan, NFP was aware

that the video footage created by Grigoryan would be used for the Propaganda Piece.

51.     Prior to entering into the Agreement, NFP was also aware that it was not working to create a pilot for the History Channel, and that none of Grigoryan's work would be used in such a pilot for the History Channel.

52.     NFP concealed and did not disclose the material facts in paragraphs 50 and 51 (the "Material Facts") to Grigoryan.

53.     On the contrary, NFP falsely represented to Grigoryan that her work would be used for a pilot to be aired by the History Channel.

54.     NFP knew the representation in paragraph 53 was false.

55.     NFP intentionally concealed the Material Facts and misrepresented facts to Grigoryan to induce her to enter into the Agreement, and to provide the video footage NFP intended to use for the Propaganda Piece.

56.     Grigoryan justifiably relied on NFP's representations.

57.     As a result of NFP's actions, Grigoryan was harmed and damaged.

58.     Grigoryan is entitled to an order rescinding the Agreement because her consent was obtained by NFP through its fraudulent conduct.

## SECOND CAUSE OF ACTION
### (Fraudulent Inducement)

59.     Grigoryan realleges and incorporates by reference each of the preceding paragraphs.

60.     NFP concealed the Material Facts from Grigoryan.

61.     NFP had a duty to disclose the Material Facts to Grigoryan, but it did not do so.

62.     Instead, NFP intentionally concealed the Material Facts with the intent to induce Grigoryan to enter into the Agreement and create material for the Propaganda Piece.

63.    Moreover, NFP falsely represented to Grigoryan that her work under the Agreement would be used for a pilot to be aired by the History Channel.

64.    Grigoryan was unaware of the Material Facts, and would not have entered into the Agreement, or created the video footage, had Grigoryan known the Material Facts.

65.    As a result of NFP's actions, Grigoryan has been harmed and damaged.

66.    Grigoryan is entitled to an amount to be determined at trial. Grigoryan anticipates that the damage caused to her as a result of NFP's fraudulent inducement is much greater than $75,000.00.

67.    In addition, Grigoryan is entitled to rescission of the Agreement because her consent and signature was induced by fraud.

## RELIEF REQUESTED

Plaintiff Grigoryan requests judgment against Defendant NFP as follows:

A. On her first cause of action, an order rescinding the Agreement.

B. On her second cause of action, (i) a monetary judgment in an amount to be determined at trial; (ii) an order rescinding the Agreement; (iii) an order declaring that Grigoryan retains all copyrights to the video footage and other work created by her and provided to NFP; or (iv) all of the foregoing.

C. Pre- and post-judgment interest, costs, and attorneys' fees.

D. For such orders or other relief as the Court deems just and proper.

DATED:  January 21, 2025          BUCHALTER
                                  A Professional Corporation


                                  By:  Zaven A. Sargsian
                                       ZAVEN A. SARGSIAN
                                       Email:  zsargsian@buchalter.com

                                       *Attorneys for Plaintiff*